# Exhibit "A"

**Albert Ortiz Consulting, LLC**
**3926 River Falls**
**San Antonio, Texas 78259**
**(210) 380-7839**

Ms. Judith Sanchez                                                                                          April 15, 2020
Assistant City Attorney
100 West Houston Street, 18th Floor
San Antonio, Texas 78205

Mr. N. Mark Ralls
Hoblit Darling Ralls Hernandez & Hudlow
6243 IH 10 West, Suite 601
San Antonio, Texas  78201

Re: Opinion Report
    Gaspar David Guzman, et al. v. City of San Antonio, et al.

I have been retained as an expert witness in the above referenced lawsuit. I served as a police officer in the San Antonio (Texas) Police Department (SAPD) for over 33 years. I held every rank in the Department before retiring as the Chief of Police in April of 2006. During my tenure, I was assigned to the Homicide Unit as a first line supervisor (sergeant) and later as the commander (lieutenant) of the unit for five years. During my tenure in the Homicide Unit, I created and commanded the Officer Involved Shooting Team. This team was responsible investigating any incident in which an officer employed deadly force against a citizen or was the victim of deadly force by another, and/or any incident between an officer and a citizen resulting in death or bodily injury.

During my career, I served as Chairman of the SAPD's disciplinary board, known as the Chiefs Advisory and Review Board, (CARB) for three and-a-half years. The disciplinary board actually consists of two separate boards. One is made up of citizens of selected by the City Council, the other an equal number of sworn members of the Department. The disciplinary board makes recommendations to the Chief of Police regarding whether an officer was in violation of the Department's policies, procedures rules and regulations. If the allegations are upheld, they recommend punishment they feel is suitable. As the Chief of Police, I was the final arbiter on all disciplinary matters.

I hold a Bachelor's Degree in Applied Arts and Sciences with an emphasis on Criminal Justice from Southwest Texas State University and a Masters Degree in Criminal Justice from now Texas State University. I previously taught Criminal Justice at San Antonio College. Throughout my career I received continuing education and training at the San Antonio Police Academy. I also attended a substantial number of additional training classes and conferences related to criminal justice and police administration outside the department. A copy of my resume is attached.

Page 2 – Guzman

My opinions on this case are based on my education, knowledge, training, and experience, as well as a review of the following:
1) Plaintiff's Original Petition;
2) Plaintiff's First Amended Original Complaint;
3) City of San Antonio's (COSA) Answer to Original Petition;
4) Individual Defendants'(J.Diehl, A. Ortiz, A. Espinoza) Original Answer;
5) Individual Defendants' First Amended Original Answer;
6) Plaintiff's Initial Disclosures;
7) Defendants' Joint Initial Disclosures;
8) Plaintiffs' Decedent's Records -Bexar County Medical Examiner's Office;
9) Plaintiffs' Decedent's Records-COSA's Fire Department/EMS;
10) COSA's Answers, Responses, and Objections to Plaintiff's Interrogatories and Request for Production;
11) A. Espinoza's Answers and Objections to Interrogatories;
12) A. Espinoza's Responses and Objections to Request for Production, Including:
    a) SAPD's Internal Affairs Investigation File,
    b) Procedure 512- Electronic Control Devices,
    c) Autopsy Photographs,
    d) Home Security Video (from 154 Rosemont Drive),
    e) Officers' Body Worn Camera Footage,
    f) Officers' COBAN Recording Footage,
    g) Audio Recordings/Statements of Officers Harralson and Espinoza; and,
13) Opinion Report: J. Rod McCutcheon.

The aforementioned are the types of documents, recordings, facts and data upon which experts in law enforcement practices and procedures rely to form opinions on the subject matter of this lawsuit. The investigation into this case was assisted by audio and video recording instruments housed in the officers' patrol vehicles (COBAN), body-worn cameras (BWC), and home security video recordings, all of which captured portions of the incident. Due to the placement of the vehicles, distance between the officers and other participants, and ambient noise, not all the incident was within view of the cameras and the audio recordings are sometimes difficult to understand.

SAPD Procedure 512 – Electronic Control Device governs an officer's use of an Electronic Control Device (ECD) which is most commonly referred to as a TASER. For the purposes of this report the terms Electronic Control Device, ECD and TASER are used interchangeably.

The incident made the basis of this lawsuit occurred at 154 Rosemont Drive, San Antonio, Texas, on May 12, 2019, at about 9:45 p.m. Claudia and Miquel Romero, the residents, had a small party in the backyard of their home starting at about noon. The invitees brought their own beer, including Gaspar David Guzman (David) who arrived at the party with an eighteen-pack of beer. At one point the beer ran out and Mrs. Romero went out and bought two more cases. During the party, David apparently offended one of

the guests. As the party went on, several of the guests left until only David and Miquel remained. When the party ended, David was hesitant to leave because he was afraid the person he had offended was outside lying in wait in order to beat him up. David called the police with his concerns and Officers Espinoza and Harralson responded.

The officers assured him he was safe and attempted to persuade David to allow Mrs. Romero to take him home. Mrs. Romero volunteered to take David anywhere he wanted. When he refused to leave, the officers advised David he could either leave with Mrs. Romero or he would have to go with them, meaning to jail. When he refused, they forcefully walked him, partly carried him out of the residence. As they approached Mrs. Romero's vehicle, David resisted the officers by letting his body go limp, planting his legs and feet on the ground and resisting the officers' forward momentum.

Still hoping to convince David to allow Mrs. Romero to drive him home, the officers were finally able to get David to the open, passenger side door of her vehicle. However, David resisted the officers by stiffening his body and using his strength to make it impossible for them to get him inside the vehicle. David successfully resisted the officers' efforts to have Mrs. Romero drive him home, or any place else he wanted to be taken, so the officers decided to arrest him.

In his sworn statement, Officer Angel Espinoza described his and Officer Robert Harralson's unsuccessful attempt to persuade David to allow Mrs. Romero to drive him home. And, how David was physically able to prevent them from putting him in her car for his ride home. After they arrested him, he resisted their attempts to handcuff him by physically overcoming their attempts to put his hands behind his back. They decided to place David on the ground in order to gain the advantage of leverage over him. However, David would not put his hands behind his back so they could place handcuffs on him. His resistance was so great both ends of the handcuffs ended up on his left arm. When Espinoza realized they were not able to overcome David's use of force, he made the discretionary decision to discharge his TASER against David. He removed his TASER from his belt and warned David numerous times that if he did not allow himself to be handcuffed Espinoza was going to use the TASER on him. When he continued to resist, Espinoza deployed his TASER in what is known as the Drive Stun Mode. The Drive Stun Mode means that instead of discharging the prongs attached to wires into the body from a distance (Probe Mode), the officer manually took his TASER and placed it against the body of the suspect. The TASER causes significant pain at the site the TASER comes into contact with the body. Unlike the Probe Mode, the Drive Stun mode does not disrupt the suspect's neuro-muscular system temporarily immobilizing him. The goal of the Drive Stun Mode is to cause a resisting suspect to concentrate on the pain and stop resisting long enough to provide the officer(s) a better opportunity to place the handcuffs on the suspect.

In his sworn statement, Espinoza said the first two times he deployed the TASER against David it was over his clothing and appeared to have "zero effect" on him.

Espinoza wondered if the TASER had malfunctioned. David continued to resist. During the continuing struggle he was able to discharge the TASER a third time directly on the skin. It seemed to stun David long enough for them to apply the handcuffs. Espinoza immediately summoned an EMS unit to the scene so they could evaluate and/or treat David for any adverse effects. Espinoza stated that during the process of applying the TASER, he continuously warned David. He also summoned his sergeant to the scene to report the deployment of his TASER which is mandated by Procedure 501 - Use of Force.

The sworn statement of Officer Robert Harralson reflects the situation as described above. He also stated that David was unusually strong and had admitted to being drunk, not to having ingested drugs. He also said Mrs. Romero reported to him that David had consumed a lot of beer but not that he used drugs. He stated that he remembers Officer Harralson deploying his TASER three times.

When EMS arrived to evaluate and treat David, he refused treatment. He would not cooperate with the medical team to the point where he would shut his eyes tightly in order to prevent them from checking them. Despite pleadings from the EMTs and the police officers, David adamantly refused treatment. He even went as far as making it quite clear he would sue anyone who treated him without his consent and/or touched him in an effort to provide treatment. Police officers do not have the authority to force a medical provider to treat someone who has refused their offer to treat him. The officers were left with the option of transporting him to jail where a medical evaluation is conducted during the jail intake process. Since David assumed total control and responsibility for his own medical treatment options, (in this case, refusal of treatment) the EMTs checked back into service in order to return to their assigned post so that they could most efficiently respond to treat others should a medical emergency arise elsewhere in the city. Failing to do so could place the lives and safety of others in need of EMS emergency medical services in jeopardy.

Because of the level of resistance David exhibited, and for his own safety, that of the transporting officer, and innocent bystanders, the officers made the discretionary decision to transport him to jail in the paddy wagon. While they waited for the paddy wagon to arrive, Officers A. Ortiz (no relationship to this author), J. Diehl and police cadet Jonathan Cokerham, had to contain David who was still talking, asking questions, attempting to get up and move around, and kicking his legs. The officers and cadet were in very close proximity, to the point of having to be hands-on in order to ensure he did not get up. From such close proximity, they were also able to monitor his condition.

Officers Espinoza and Harralson were exhausted from the prolonged altercation with David, they took a break to catch their breath. After several minutes, David appeared to be settling down. The officers believed the exertion during his initial scuffle, his continued efforts to get up off the ground even after being handcuffed had exhausted him, as well. When David began to gag and eventually threw up, they believed it was due to

the exertion coupled with the copious amount of beer he had reportedly consumed. As they continued to monitor him they realized his pulse and heartbeat were weak and asked EMS to return to the scene. David did not respond to treatment and died at the scene. It was approximately five minutes and thirteen seconds between the time David is recorded on video laying on the ground and the time he appeared to be wanting to throw up and went into medical distress.

Mr. and Mrs. Romero provided sworn statements as part of the investigation. Mrs. Romero stated she knew David was drunk because he consumed a lot of beer, his speech was slurred and he was tripping over his own feet. When he made it impossible for the officers to put him inside her vehicle for a ride home, the officers told him he was under arrest. She saw him physically resist the officers. She saw David refuse to follow the officers' commands and stated he was actually doing the opposite of what they ordered him to do. She said the two officers were not physically able to handcuff David. It was not until more officers arrived to help them that together they were finally able to secure him. During Sgt. K. Maurice's initial, on-scene investigation (recorded on his BWC), Mrs. Romero told him that David did not take any drugs at their home.

In his statement, Mr. Romero said he invited a few close friends to his home to celebrate his birthday. At the end of the party, he and his wife did not want David to drive home because he was intoxicated. When the officers arrived they tried to persuade David to allow Mrs. Romero to drive him home. When they tried to put him in her car, he resisted. The officers then tried to handcuff David but he was too strong. The three of them fell to the ground. Mr. Romero believes some firefighters arrived and helped the officers put David inside a patrol vehicle. David got out of the patrol vehicle so the officers put him on the ground. As the officers and David struggled on the ground, one of the officers deployed his TASER against David. He quit struggling and the officers and firefighters tried to help him. In their respective statements, Mr. and Mrs. Romero said Officers Espinoza and Harralson were only trying to help David, gave him options, and did not appear to have done anything wrong.

While Officers Espinoza and Harralson were made aware David had consumed copious amounts of beer, they received no information and there was no evidence David had mixed his alcohol with cocaine. One of the difficulties police officers encounter when they are expected to make an accurate roadside diagnosis of suspects who are mentally ill, under the influence of drugs or alcohol, are medically ill (e.g., heart problems, diabetes) and/or a combination thereof, is that the symptoms, signs, and/or legal definitions of the different conditions are not unique to the individual condition; they most often have the same or similar symptoms or combination of symptoms. The problem is exacerbated when the suspect intentionally combines illicit drugs and alcohol as David did in the instant case. Drunks are just as likely to ramble incoherently, repeat themselves, smell of intoxicants, exhibit unusual strength, trip on their own feet, as someone who is mentally ill and suffering from delusions or someone who has an illness such as diabetes and has indulged in drinking and/or illicit drugs. The officers handling

these situations must necessarily rely upon the information provided to them by witnesses and their own observations. Unfortunately, they are often making split-second decisions while fighting to overcome the suspect's resistance or aberrant behavior. The officers do not have the luxury of making the diagnosis in a calm, comfortable atmosphere, with modern medical and scientific equipment, peer reviews, and the benefit of 20/20 hindsight before having to make a final decision.

David was described as being very strong but not dynamically so. In my training and experience, a suspect in the throes of acute cocaine intoxication in combination with alcohol use, and who engages in a struggle with officers will exhibit a tell-tale sign of "superhuman strength", as described by the officers trying to detain him. A level of strength that may require five or six officers and the deployment of intermediate weapon(s) to overcome. That tell-tale level of strength, which might have indicated to the officers David was high on cocaine, was conspicuously absent in this case. Even with such information, the officers still have a duty to take him into custody and provide him with medical treatment. Officers Espinoza, Diehl and Ortiz did so as soon as possible. However, David adamantly refused treatment and emphasized his right to refuse by threatening to sue the EMTs or anyone who tried to provide him unwanted medical care. The officers cannot force someone in their custody to accept medical treatment without his consent. By the same token, officers do not have the authority to force medical providers to treat a person in their custody who has refused treatment from them.

In the instant case, the information the officers were provided and which would necessarily influence their decisions, was that David admitted and the homeowners were aware he had been drinking, but none reported to the officers he had ingested any illicit drugs, including cocaine. The officers were not provided any information that would indicate David had experienced previous episodes or history of mental illness, including paranoia. His so-called paranoia could have just as likely been the result of his intoxicated mind, or a well-founded fear that he had offended someone enough to anger them to the point they intended to retaliate against him. It is an almost daily occurrence in any city the size of San Antonio that people gather to drink and settle their disagreements with assaults of varying degrees which often result in injuries or death.

While exhibiting signs of intoxication, David appeared to be in sufficient control of his faculties. He spoke rationally, had the presence of mind to seek the advice of an attorney, argued the particulars of the criminal trespass and public intoxication laws with the officers, and insisted on receiving his Miranda Warning rights. He was also sufficiently aware of his right to make his own decisions regarding his medical treatment, including the right of refusal, and his right to sue for violations of those rights. When he overheard the officers say a sergeant was en route to the scene, he was sufficiently in control of his faculties to recognize a sergeant has supervisory authority and could overturn the decisions made by his officers. So, he insisted on talking to him.

Page 7 - Guzman

The Plaintiffs claim:

1) The COSA was negligent in not providing its police officers sufficient training in the dangers of positional asphyxiation when they deploy a TASER against a citizen and place him in handcuffs behind his back then place him into a prone position with his face on the ground.;
2) The COSA was negligent because no action was taken to know what to do or how to assist David; and,
3) The Plaintiffs also claim the officers were negligent because they were insufficiently trained by the COSA in the dangers of asphyxiation when using a TASER on a person then placing him face down on the ground and applying pressure on his back.

The COSA through the San Antonio Police Academy is authorized by the Texas Commission on Law Enforcement (TCOLE) to provide the initial basic training to police cadets and ongoing (in-service) training to veteran officers. TCOLE is the agency responsible for setting the standards and licensing of all peace officers in the State of Texas. I am familiar with the SAPD's Training Academy curriculum for police cadets and in-service training for its licensed police officers. The SAPD training curriculum meets and in many instances exceeds the minimum standards set by TCOLE. TCOLE requires approximately six-hundred and eighteen (618) hours of instruction for a candidate to obtain the Basic Peace Officer Certification (BPOC). Through the SAPD Training Academy, the COSA provides its police cadets training in the subjects mandated by the State for the BPOC. Beyond the BPOC curriculum, the COSA provides approximately six-hundred and fifty (650) additional hours of training in law enforcement related subjects. The SAPD's training curriculum includes, but is not limited to such areas as the Penal Code, Code of Criminal Procedure, Crisis Intervention Training (CIT), Mental Health Crisis (MHC), Electronic Control Devices (ECD), positional asphyxiation, probable cause, use of force, treatment of prisoners and civil rights. TCOLE requires twenty-four hours of Crisis Intervention Training. The SAPD provides its officers forty hours of Crisis Intervention Training and Mental Health Crisis training. The aforementioned directives and guidelines may be found in the rules and regulations, policies and procedures handbook commonly referred to as the SAPD's General Manual.

The provisions of the General Manual and the police cadet training curriculum are taught during the initial six-month training at the SAPD Academy. Each newly graduated officer is considered a probationary officer and is required to ride with a specially trained, veteran officer (Field Training Officer / FTO) for fourteen (14) weeks. Every SAPD officer is required to attend forty (40) hours of continuing education, training and work-related updates during the Department's **annual** In-Service Training. TCOLE only requires forty (40) hours of In-Service Training every **two** years. SAPD officers and police cadets receive their training in various forms, including academic instruction, practical application, practical problems and on-the-job training. Some

changes in laws, court decisions, procedures, etc. may require that officers receive immediate training updates. This training is conveyed through the Daily Bulletin issued by the Chief of Police and/or by an instructor or videotaped instruction at the officers' roll call. All officers of the SAPD, including, the defendant officers are required to be licensed by TCOLE. In my opinion, the COSA provides sufficient and appropriate training to its SAPD officers.

It is also my opinion Officers A. Espinoza, J. Diehl and A. Ortiz successfully completed the TCOLE mandated Basic Peace Officer Curriculum and the additional training required by the COSA/SAPD for police cadets to graduate from the Academy and become full-fledged officers. In my opinion, at all times during the incident made the basis of this lawsuit, Officers Espinoza, Diehl and Ortiz were certified and licensed Texas peace officer and were members in good standing of TCOLE and the SAPD. It is also my opinion any officer in the same or similar circumstances as Officers Espinoza, Diehl and Ortiz could reasonably believe they were acting according to their training and abiding by the policies and procedures of the COSA regarding positional asphyxiation, the deployment of a TASER, and follow-up medical procedures and could have acted in the same or similar manner.

Officer Espinoza was the only officer to deploy his TASER. The TASER is classified as a non-deadly, intermediate force weapon. It is designed to temporarily immobilize a resisting suspect and as a pain compliance tool to help officers accomplish a legitimate police objective. All SAPD officers, including Espinoza, must successfully complete an ECD training course and be certified in its use by TCOLE before he is authorized to carry a TASER. In addition, the officer must complete a forty (40) hour course in Crisis Intervention Training before being authorized by the Chief of Police to carry an ECD. An officer authorized to carry an ECD must attend and successfully complete an annual recertification course at the SAPD Training Academy. At the time of the incident made the basis of this lawsuit, Officer Espinoza was certified by TCOLE thru the SAPD Training Academy in the use of the Electronic Control Devices (TASER). In addition, his assignment with an FTO officer and his time on patrol has provided him with on-the job training and experience in these areas.

After Espinoza deployed his TASER, they were able to handcuff David. It is the policy of the COSA/SAPD for officers to handcuff prisoners with their hands behind their back. Handcuffing prisoners in front provides them an excellent opportunity to use their hands, arms, and the handcuffs themselves to resist arrest, strike and injure the officers and innocent bystanders.

Contrary to the Plaintiffs' claim the defendant officers did not know what to do or how to assist someone in David's condition after being hit with a TASER discharge, their actions indicate they knew exactly what to do. Immediately after Officer Espinoza's discharge of his TASER, the officers summoned EMS and a sergeant to the scene as COSA procedures provided by the COSA dictate. As previously described, David

Page 9 - Guzman

refused even the most basic medical evaluation and treatment by EMS. In my opinion, any officer in the same or similar circumstances as Officers Espinoza, Diehl and Ortiz could reasonably believe they were acting according to their training, the policies and procedures of the COSA regarding medical treatment for someone who had been subjected to a TASER discharge and could have acted in the same or similar manner.

Because of his violent nature, the officers decided to transport David in a paddy wagon for his safety, that of innocent bystanders, and the transport officer. David continued to resist his detention and continued to want to get up, move around, and was kicking his legs. This required Officers Ortiz and Diehl, as well as cadet Cokerham to use different hands-on strategies in response to David's actions. This close contact with him, provided the officers with the opportunity to monitor his condition. At different times David can be heard yelling that he can't breathe. However, he continued to talk, raise his head, and turn right and left and yell for about five more minutes. At one point he heard the officers mention the sergeant was on the way to the scene. David quickly insisted he be allowed to talk to him and yelled out for him several times.

Contrary to the medical examiner's report that David was placed in a hog-tied position, the video and audio recordings, as well as officer reports, contradict that opinion. The COSA has a policy prohibiting officers from using hog-tie maneuvers. At no time was David placed face down with his hands and feet bound behind him (hog tie). Officer Diehl temporarily (about fifty seconds) folded David's legs in order prevent him from kicking Officer Ortiz. During this time it did not appear David's ability to breathe was restricted. He appeared to be moving and talking just as he had been prior to this temporary restraint. As soon as it appeared David had calmed down and was no longer a threat to kick the officers, Diehl released his legs and allowed him to stretch them. There did not appear to be a change in his ability to breathe after Diehl released his legs. Officer Ortiz, who was crouched next to David, also warned David not to kick her. Two officers were seen on video on each side of David and putting pressure on each of his shoulders to keep him from getting up. The video does not show anyone putting pressure on his back or areas of the lungs. During that time, it did not appear David was struggling to breathe, or any officer was obstructing his ability to breathe. Quite the contrary, the recording show David was moving, talking and yelling.

The Plaintiffs also complain:

1) The COSA was negligent because it took no action to allow David to breathe for a long period of time and none of the officers appeared to know how to assist David;
2) The officers were negligent because they failed to follow procedures and failed to ensure EMS was present, and stayed, when the use of excessive force such as the TASER was used; and,
3) The officers were negligent because they failed to follow training procedures and policies regarding "non-excessive" force.

Page 10 – Guzman

The Plaintiffs' conclusory statements about the officers' use of "excessive force", and "non-excessive force", are addressed later on in this report. The COSA provided the defendant officers with training in Procedure 512 – Electronic Control Devices and the treatment of suspects subjected to a TASER discharge. The COSA also provided the defendant officers training in Procedure 611 – Mentally Ill Persons and Crisis Intervention Training. These training blocks exceed the training required by TCOLE. In my opinion, the COSA provided sufficient and appropriate training, and the policies and procedures sufficient for the defendant officers to discharge their discretionary duties regarding medical treatment (including breathing problems) for persons in their custody in a similar situation/condition as David.

Officers Espinoza, Diehl and Ortiz successfully completed the TCOLE mandated training and the extra training required by the SAPD. The officers tried to avoid arresting David, attempted to get him home safely, tried to avoid engaging him in physical exertion, then immediately summoned EMS when they had to wrestle with him and deployed a TASER. EMS made the scene and attempted to provide a medical evaluation and treatment. Despite pleas from the police officers and EMTs, David invoked his right to refuse treatment, assumed the responsibility for his medical options, and emphasized it with a threat to sue whomever tried to treat him without his consent. The defendant officers do not have the authority to force medical personnel to treat a person whom they know made it perfectly clear he did not want to be treated by them and refused treatment. The officers attempted to transport David to jail where he would undergo a medical evaluation as part of the intake process. Keeping the EMS unit out of service and at the scene could have compromised their ability to efficiently respond to medical emergencies in other parts of the city and placed the lives and safety of others in jeopardy. It is my opinion any officer in the same or similar situation as Officers Espinoza, Diehl and Ortiz could reasonably believe they were acting according to their training, the policies and procedures of the COSA and could have acted in the same or similar manner.

The Plaintiffs also claim, "The officers were negligent in applying continuous tasing to a person." There is no evidence in the record of this case that any officer deployed his TASER continuously against David. The only officer to utilize his TASER was Officer Espinoza. He discharged it three separate times for what he estimated were five-second bursts. David was not affected by the TASER the first two times, apparently because the TASER was placed over his clothing. The third time the TASER made direct contact with David's bare skin and created the desired pain compliance reaction. David temporarily quit struggling which allowed the officers to handcuff him. They ceased their use of force immediately after handcuffing him except for the strength needed to escort David to a patrol car. It is my opinion any officer in the same or similar circumstances as Officer Espinoza could reasonably believe his decision to use force and the level of force he applied were reasonable and immediately necessary and could have acted in the same or similar manner.

Page 11 – Guzman

The Plaintiffs claim:

1) The COSA was negligent because it failed to provide sufficient training to officers and employees in recognizing delirium or other mental disorders;
2) The officers were negligent because they were not trained, or were improperly trained to recognize signs of delirium and other mental disorders; and,
3) The officers were negligent because they were unfamiliar with how to respond to this situation without using deadly force.

The Plaintiffs' conclusory statement about the officers employing "deadly force" is addressed later in this report. The Plaintiffs provided no evidence David was suffering from delirium or other mental disorders. As previously described above, the COSA provided Officers Espinoza, Diehl, and Ortiz with training in excess of that mandated by TCOLE in recognizing and responding to people suffering from delirium or mental disorders. The COSA provides forty hours of training as compared to the twenty-four required by TCOLE. In addition, the FTO officer program new officers are required to successfully complete provides them the opportunity for on-the-job training and experience in these areas. The COSA also provided the defendant officers with the policies and procedures, as previously described above, by which they discharged their discretionary duties regarding recognizing the symptoms of delirium and mental disorders. In my opinion, the COSA provides adequate and appropriate training in the subject of delirium and mental disorders to its police officers.

Officers Espinoza, Diehl and Ortiz successfully completed the aforementioned TCOLE mandated training and the extra training required by the SAPD. In my opinion, any officer in the same or similar circumstances as Officers Espinoza, Diehl and Ortiz could reasonably believe they were abiding by their training and the policies and procedures of the COSA and could have acted in the same or similar manner.

Regarding the Plaintiffs reference to the officers' use of "excessive force, "non-excessive force, and "deadly force", the COSA provides SAPD officers, including officer Espinoza, the training, policies and procedures in the use of force. Procedure 501 – Use of Force governs an officer's use of force to accomplish legitimate police objectives. SAPD officers are trained to employ a use of force matrix in their application of force. The matrix, sometimes referred to as a use of force continuum, is taught in the same basic manner, to police officers throughout the nation. In general terms, the matrix refers to an escalating level of force which is usually a degree higher than the force or resistance offered by the person being detained by the officer. Although each situation is different, and an officer may have to immediately resort to a higher level of force without first employing lower levels, the matrix generally consists of:

a) Officer's Presence – An officer's presence at a scene in uniform and/or marked patrol vehicle projects a display of authority which has a calming effect on those

Page 12 – Guzman

      present. Persons contemplating the commission of a crime or in the act of committing a crime are likely to abandon the notion or discontinue their course of criminal conduct simply because of the officer's presence.
  b) Verbal Communications – Includes persuasion, warnings, orders, and commands;
  c) Open/Empty Handed Control Techniques – The force needed to manipulate a person's arms and hands during handcuffing; gripping or holding someone; pressure point techniques; come-along holds; and take-downs; does not include strikes with the hands, fists, or feet;
  d) Physical Force – An officer's strength and agility and may include compliance strikes with the hands, fists, and feet. The goal is to temporarily direct a suspect's attention away from resisting or attacking an officer and redirecting it to the pain resulting from the compliance strike. The intent of compliance strikes is to convince the suspect to give up. In the alternative, while the suspect is distracted by the pain, he/she will temporarily quit attacking/resisting and provide the officer with the time and opportunity necessary to overcome the force offered by the suspect and complete the handcuffing process;
  e) Intermediate Weapons – Non-deadly weapons including batons, bean bags, Electronic Control Devices (TASER), oleoresin capsicum (O/C) spray; and,
  f) Deadly Force – Force that in the manner of its use or intended use is known to cause or capable of causing death or serious bodily injury.

    It is clear the defendant officers were in their regulation SAPD uniform and operating marked units when they responded to David's call for police services. This satisfies the Officer Presence element of the use of force matrix. According to Mr. and Mrs. Romero, BWCs, and the home videos, the officers tried to reason with David and talk him into allowing Mrs. Romero to give him a ride home. They warned him that he was no longer wanted at the residence and if he did not go with Mrs. Romero the officers would arrest him. They ordered him to leave but he refused. This would satisfy the Verbal Communications element of the use of force matrix. The officers eventually grabbed him by the arms and pushed and partly carried him outside the residence. This would satisfy the Open/Empty Handed Control Techniques. When they tried to maneuver his body toward the passenger side door of Mrs. Romero's vehicle, David used his legs for leverage to plant his feet on the ground and pushed against the officers' forward momentum. They had to use their strength in order to overcome David's resistance. When they got him to the open door they once again had to use their strength and agility to overcome David's stiffened body as he successfully prevented them from putting him inside the vehicle. They finally arrested him and when he resisted, they put him on the ground in order to use their leverage against him. This would satisfy the Physical Force element of the use of force matrix. David would still not put his hands behind his back and allow himself to be handcuffed. When it became apparent to Espinoza they could not handcuff him, he deployed his TASER. This would satisfy the Intermediate Weapon element of the use of force matrix. The defendant officers did not resort to the use of deadly force. Nothing in the record of this case indicates Officer Ortiz was present when David was arrested and the scuffle ensued. Instead, the record

indicates she was only present when he was already handcuffed and on the ground and she was monitoring him. It is my opinion that any officer in the same or similar circumstances as Officers Espinoza and Diehl could reasonably believe their decision to use force and the level they employed was reasonable and immediately necessary and could have acted in the same or similar manner. It is also my opinion the actions of Officers Espinoza and Diehl comport with their training, the policies and procedures of the COSA/SAPD and are considered acceptable conduct in the law enforcement profession.

The Plaintiffs claim the officers were negligent because they used physical force without due process on a person who had not committed a crime nor was suspected of committing a crime. The witness statements, video and audio recordings, and officer reports refute this claim. The officers told David he was no longer welcome at this residence and was provided options short of being arrested. The officers and Mr. and Mrs. Romero tried to persuade him to let Mrs. Romero drive him home. Eventually, he was warned that he would be arrested if he did not leave with Mrs. Romero. He refused to leave the residence and was arrested. Video footage clearly shows he resisted the officers' efforts to take him into custody. David managed to successfully resist the efforts of the officers to handcuff him. His resistance could not be overcome until he was hit with the TASER discharge. There is no evidence the defendant officers employed any force beyond the intermediate weapon (TASER) and certainly did not employ deadly force.

It is my opinion that any officer in the same or similar circumstances as Officers Espinoza, Diehl and Ortiz could reasonably believe probable cause existed to believe David was in violation of Texas Penal Code Section 30.05 – Criminal Trespass and could have acted in the same or similar manner.

It is also my opinion any officer in the same or similar circumstances as Officers Espinoza, Diehl and Ortiz could reasonably believe probable cause existed to believe David was in violation of Texas Penal Code Section 38.03 – Resisting Arrest, Search or Transport and could have acted in the same or similar manner. According to the Penal Code, it is no defense to prosecution the arrest was unlawful.

The Plaintiffs claim the COSA did not insure the TASER unit was operable and its officers were trained in the proper use of the drive stun technique. Espinoza's training and certification in the use of the TASER, including the drive stun technique, has been previously documented in this report. There is no evidence Espinoza's TASER malfunctioned. The only reference to the TASER in this context was not about the condition of the TASER but to Espinoza's surprise that David did not feel the pain ("zero effect") until the third discharge. It is my opinion the TASER was functioning as designed. Regardless, the Plaintiffs could not articulate or provide evidence how David could have been harmed if the TASER did not work and David experienced "zero effect".

Page 14 – Guzman

The Plaintiffs allege the COSA has failed to properly train, supervise, or discipline officers who routinely use excessive force which has resulted in a policy that condones the use of excessive force. The Plaintiffs have reached this conclusion without being able to provide a single example or any evidence to support their claim. In some instances the policies and procedures, customs and practices governing members of the SAPD are more restrictive than the provisions of the law. However, in all instances they are constructed to ensure all persons in police custody are treated humanely and their constitutional rights safeguarded. In my opinion there are no written or unwritten patterns, customs, or practices in the SAPD that condone the use of excessive or unnecessary force, illegal arrests/detentions, or otherwise infringe on the rights and privileges guaranteed by the U.S. Constitution.

It is my opinion that at all times during the incident made the basis of this lawsuit, Defendant Officers A. Espinoza, J. Diehl and A. Ortiz were on duty, wearing the distinctive uniform of the SAPD, operating clearly marked patrol vehicles, and their identity and authority was or should have been apparent to any reasonable person. It is also my opinion the defendant officers were acting in the course and scope and in furtherance of their employment as police officers for the COSA and engaged in the discharge of their discretionary duties and responsibilities as licensed and certified peace officers for the State of Texas.

In my opinion, at all times during the incident made the basis of this lawsuit, Defendant Officers A. Espinoza, J. Diehl and A. Ortiz acted as any reasonable officer in the same or similar circumstances as the defendant officers and could have acted in the same or similar manner.

I reserve the right to amend or add to my opinions should more information become available regarding this lawsuit. I am compensated at the rate of $250.00 per hour for review and creation of documents and consultation with attorneys. Deposition and trial testimony is charged at a flat rate of $1,500.00.

Thank you,

*Albert A. Ortiz* (signature)

Albert A. Ortiz